**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 13-40050-01-JAR |
| | ) |
| SHAWN TURNER, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER
## GRANTING DEFENDANT'S MOTION TO SUPPRESS

This matter is before the Court on Defendant's Motion to Suppress (Doc. 28) evidence

derived from a search of Defendant Shawn Turner's person and the vehicle in which he had been

a passenger. On September 4, 2013, the Court held an evidentiary hearing on the motion to

suppress. Defendant filed a post-hearing brief on September 27, 2013, and the Government

responded on October 3, 2013, at which time the matter went under advisement. Having

reviewed the evidence and arguments presented by the parties, the Court is now prepared to rule.

The Court will suppress the marijuana and the firearm discovered by these officers because the

Government has failed to meet its burden of showing that the searches were lawful.

**I.     Facts**

Based on the testimony and the videotape evidence submitted at the suppression hearing,[1]

the Court finds the following facts by a preponderance of the evidence. On March 15, 2013,

Topeka Police Bike Unit officers—Officer Lance Green, Corporal Jayme Green, and Officer

Joseph Ralston—approached a red Pontiac sedan that was illegally parked in a fire lane at a busy

---

[1]Officer Ralston wore a video camera mounted to the side of his glasses. Ex. 1. Officer Ralston testified that Exhibit 1 is a true and accurate account of the March 15, 2013 encounter. Because the camera was mounted to his body, he is heard, but not seen on the tape.

convenience store parking lot at Sixth and Carnahan in Topeka, Kansas. All three officers were armed and in uniform. Defendant Shawn Turner was in the process of exiting the driver's side of the Pontiac, but started to get back into the vehicle and reach for the floorboard after he noticed the officers. As the officers approached, Defendant was seated in the driver's seat with the door open and his feet sticking out. He then exited the vehicle and shut the door behind him.

Officer Green asked Defendant for identification and Defendant was cooperative. He gave Officer Green his Kansas identification, which he retrieved from a stack of credit cards in his pocket. He did not have a driver's license. At this point, the officers asked Defendant to move to the rear of the vehicle with them and discussed with Defendant his travel plans. Officer Ralston looked inside the vehicle through the windows. Both front door windows were closed, but both back door windows were open.

Defendant told Officer Green that his girlfriend, Maria Richard, had driven the vehicle and parked in the fire lane, and that she was inside the store buying motor oil. Richard then walked out of the convenience store with a bottle of oil, and confirmed that the Pontiac was her car and that she had been driving. Richard testified that she shared the vehicle with Defendant, that he had some of his possessions in the car, and that he sometimes put his own money toward gas and repairs for the vehicle. She testified that the Pontiac was their primary form of transportation and that he drove the vehicle with her permission.

Defendant stood behind the vehicle with Corporal Green and Officer Ralston while Officer Green spoke to Richard on the passenger side of the vehicle about the fire lane violation. Richard looked through her purse for her ID. At this point, Defendant and Richard spent several minutes talking to the officers and they all appeared to be waiting for something. Officer Green

ran both Richard's and Defendant's identifications through dispatch for "wants and warrants," although he cannot recall exactly how far into the encounter he did this. And he could not recall if he checked for Richard's record at the same time as Defendant's. Officer Green admitted that he initially did not suspect Richard or Defendant of any criminal activity and that they were being held for the sole purpose of a wants and warrants check. Officer Green then asked Richard for her insurance information, so she then opened the passenger side door to retrieve documents. That door remained open for the rest of the encounter. Officer Green walked around to the driver's side of the vehicle and leaned his head in through the open window on the back door, remaining there for at least a full minute.

Defendant spoke with Corporal Green and Officer Ralston behind the vehicle while Officer Green spoke to Richard. Defendant was cooperative and the officers testified that he was not threatening and his behavior raised no concerns. Defendant was extremely talkative, but comfortable. Defendant appeared relaxed, at one point calling out "C.J.!" to an acquaintance walking into the convenience store, and "TGIF!" Defendant held in his hands what appeared to the officers to be a Black and Mild cigar, and eventually emptied its contents into a plastic bag in front of them in a very calm manner. Officer Ralston described Defendant's actions as methodical and deliberate. The officers knew from their training and experience that marijuana users sometimes empty and refill a cigar such as this one with marijuana. Defendant put the empty cigar back into his right front pocket. Officer Ralston noticed a white string with a knot hanging out of Defendant's left front pocket.

Defendant repeatedly adjusted his pant legs—his pants were baggy—and put his hands in his pockets several times. Officer Ralston told Defendant to keep his hands out of his pockets;

Defendant said "alright" and advised he was looking for his lighter. Officer Ralston asked if he had "anything" on him. Defendant replied, "no man," and patted his right front pocket. Officer Ralston said, "I'm going to pat you down. That way you can go into your pockets." Officer Ralston was primarily concerned with Defendant's right front pocket because it was facing away from him.

Officer Ralston instructed Defendant to turn around with his back toward the officer and place his hands behind his back; Defendant complied. Officer Ralston was wearing gloves during the pat down. He first patted down Defendant's right front pocket and, without asking, pulled out the contents: a cigar, a phone, and a lighter. He placed the lighter in Defendant's hands and returned the other items to Defendant's pocket. At this point, Officer Ralston testified that he was no longer worried that Defendant possessed a weapon, but he continued to pat down Defendant's back pockets, then his left front pocket. On the exterior pat down of the left front pocket, Officer Ralston asked "What is this right here?" He stated on the video that it felt like there was a baggie and asked if something was in it. Officer Ralston testified that he felt two "semi-soft packages," which he believed contained marijuana based on his training experience. Defendant told Officer Ralston to pull it out. He first retrieved a stack of credit cards and a packet of kool-aid, then a small drawstring canvas bag. Within seconds, the officers handcuffed Defendant and Richard. Defendant asked if Richard was under arrest too. The officers emptied all of Defendant's pockets and one of them stated that if they could not find anything more, they were going to give Defendant a ticket and "kick him loose."

While Officer Ralston continued to empty Defendant's pockets, Corporal Green opened

the driver's side front door and leaned inside the vehicle at approximately the 9:14 mark. Officer Green moved to the passenger side and leaned his entire body inside the front passenger area through that open door. They instructed Defendant and Richard not to talk. They did not obtain consent to search the vehicle. The officers spent the next eleven minutes searching the vehicle, including the trunk. At the 12:51 mark, Corporal Green can be seen on his knees looking inside the front driver's side of the vehicle.

While Officer Green and Corporal Green searched, Officer Ralston eventually directed Defendant and Richard to stand to the side and rear of the vehicle and engaged them in conversation. Defendant continued to exhibit a talkative and relaxed demeanor with Officer Ralston during the vehicle search. He talked about "smoking weed" on the highway and in the privacy of one's own home. He discussed the harm of driving while under the influence of alcohol versus marijuana. He joked with the officers, making fun of their shoes.

Dispatch returned an active but non-extraditable Missouri warrant for Defendant. Officer Green testified that they would normally release a person with a non-extraditable warrant. Officer Green could not recall whether the records check came back before or after the pat down. Officer Ralston testified that Officer Green told him about the outstanding warrant after he handcuffed Defendant. The video does not make clear exactly when the records check was returned. However, it appears that they were waited for something other than the vehicle search between the time they discovered the marijuana the time they informed Defendant he was being taken in for being a felon in possession of a firearm, a period of approximately twenty minutes. At about the 16:55 mark, Officer Green asked Defendant and Richard if they had ever been convicted of a felony. At the end of the thirty minute encounter, Officer Green informed

Defendant he had a felony and could not own a gun "for a period of time." The officers told Defendant and Richard that they were being transported to talk to a detective about Defendant's criminal history.

Officer Green did not return Defendant's ID at any point during the encounter. Corporal Green testified that Defendant was not free to leave the scene of the encounter from the time the officers first came into contact with him. Indeed, Defendant was surrounded by three officers throughout the encounter. Officer Green testified that he had no reason to place Defendant under arrest until they discovered the marijuana in his pocket and that they never had a reason to arrest Richard.

Topeka Police Officer Jake Cobler testified that Defendant made unsolicited incriminating statements to him while being transported to the Shawnee County Jail. He admitted to having a prior felony conviction and asked when he could have his gun back. Special Agent Kirk Steward testified that he interviewed Defendant at the Topeka Police Department and that he waived his Miranda rights before making incriminating statements.

## II. Discussion

### A. The Patdown Search

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[2] The Tenth Circuit has defined three types of police-citizen encounters:

> (1) consensual encounters which do not implicate the Fourth
> Amendment; (2) investigative detentions which are Fourth
> Amendment seizures of limited scope and duration and must be

---

[2]U.S. Const. amend. IV.

> supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.[3]

The parties agree that this case involves the second type of encounter, an investigatory detention. During a lawful investigatory detention, "[t]o justify a patdown of the driver or a passenger . . . , just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous."[4] Defendant does not challenge the legality of the initial investigatory detention in this case based on the fire lane violation, but argues that the officers lacked reasonable suspicion that Defendant was armed and dangerous.

In determining whether the officers had reasonable suspicion that Defendant was armed and dangerous, the Court considers the totality of the circumstances and views "the officer's conduct through a filter of common sense and ordinary human experience."[5] "'[I]n determining whether the officer acted reasonably . . . , due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.'"[6]

At the time of the patdown search, Defendant was temporarily detained for an illegal parking violation. Just prior to the patdown, Defendant emptied out a cigar and put it in his pocket, which Officer Ralston recognized in his training and experience as a precursor to filling

---

[3]*United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007) (citation and quotation marks omitted).

[4]*Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

[5]*United States v. Garcia*, 459 F.3d 1059, 1064 (10th Cir. 2006).

[6]*Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

the cigar with marijuana. At this point, Officer Ralston had no information about Defendant's criminal history. While the evidence shows that the officers may have had reasonable suspicion that Defendant possessed marijuana on his person, the Government has not met its burden of showing that they had any reason to believe that Defendant was engaged in drug distribution, sufficient to form a reasonable suspicion that Defendant was armed and dangerous.[7]

Corporal Green and Officer Ralston both testified that Defendant was nervous and fidgety during the encounter. It is true that extreme nervousness may be a factor in showing reasonable suspicion.[8] However, reasonable suspicion cannot be based on nervousness alone.[9] And the video does not corroborate the officers' testimony that Defendant was nervous. In contrast, it is apparent from the video that Defendant was relaxed and comfortable for the duration of the encounter. He was comfortable enough to empty out a cigar and talk openly to the officers about his marijuana use; he yelled out to a friend, and smiled and joked with the officers.

Officer Ralston testified that Defendant kept putting his hands in his pockets, despite being told not to. Officer Ralston testified that he was concerned with Defendant's right front pocket, because that side was turned away from him. The video shows Defendant remove something from his back left pocket, then return the item to his back left pocket. Officer Ralston instructed him to "Keep your hands out of your pockets." Defendant replied "alright," and stated

---

[7]It is reasonable for an officer to believe that a person engaged in drug distribution or drug transactions may be carrying a weapon for protection. *See, e.g.*, *United States v. Johnson*, 364 F.3d 1185, 1194–95 (10th Cir. 2004); *United States v. Holmes*, 487 F. Supp. 2d 1206, 1215 (D. Kan. 2007).

[8]*See United States v. Simpson*, 609 F.3d 1140, 1147–48 (10th Cir. 2010); *Holmes*, 487 F. Supp. 2d at 1215.

[9]*See Simpson*, 609 F.3d at 1147–48; *Holmes*, 487 F. Supp. 2d at 1215.

that he was just looking for a lighter. Officer Ralston asked Defendant if he had a weapon and Defendant said, "no man" while touching his right front pocket. At this point, Officer Ralston told Defendant that he was going to pat him down. The officers all testified that they did not feel threatened by Defendant, and that they were not fearful for their safety. They agreed that he was cooperative, and this is corroborated by the video. It is not evident from the video that Defendant disobeyed Officer Ralston's directive to keep his hands out of his pockets. In fact, he complied with that directive. The Court cannot find that this fact alone could support a particularized basis for suspecting Defendant was armed.[10]

Moreover, the Supreme Court has explained that "'[i]f the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed.'"[11] Officer Ralston testified that he was only concerned about the contents of Defendant's right front pants pocket because it was facing away from him—once he searched that pocket, he testified that he was no longer concerned that Defendant possessed a weapon. Officer Ralston did not testify to feeling anything during the exterior patdown that he suspected was a weapon. Yet, Officer Ralston went beyond a protective exterior pat down and

---

[10]The Government makes the conclusory argument in its post-hearing brief that "had the pat down not occurred when it did, it surely would have happened when the warrant for defendant's arrest was discovered. Particularly because, as the police reports indicate, the Missouri warrant identified the defendant as armed and dangerous." Doc. 45 at 9. First, Officer Green testified that he received a warrant return during the encounter and could not recall where in the sequence of events this occurred. He testified that it was a non-extraditable warrant that they would not have arrested Defendant on this basis alone. Moreover, there is no police report or other evidence about the warrant in the record, so the Court cannot accept as true the assertion that the warrant indicated Defendant was armed and dangerous.

[11]*Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Sibron v. New York*, 392 U.S. 40, 65–66 (1968)).

emptied Defendant's pockets.[12]  The scope of the search exceeded the scope of the exterior

patdown search for officer safety.

### 1.      Plain Feel

The government argues that Officer Ralston was justified to empty the front left pocket

under the plain feel doctrine; he suspected that the bulge he felt during the exterior patdown was

narcotics.  It is true that if, while conducting a legitimate protective search of a suspect for

weapons, an officer discovers contraband other than weapons, he is not required to ignore the

contraband.[13]

> If a police officer lawfully pats down a suspect's outer clothing
> and feels an object whose contour or mass makes its identity
> immediately apparent, there has been no invasion of the suspect's
> privacy beyond that already authorized by the officer's search for
> weapons; if the object is contraband, its warrantless seizure would
> be justified by the same practical considerations that inhere in the
> plain-view context.[14]

Here, the government argues that "[i]t is reasonable to believe that an experience [sic] officer

could detect the immediate apparent nature of marijuana in one's pocket, thus establishing

probable cause."[15]  But this is not the standard.  Assuming that the patdown was lawful, the

Court must determine whether it was immediately apparent to Officer Ralston that the object in

Defendant's left front pocket was marijuana.  Again, the Court finds that the Government has not

met its burden of proof on this question.  Officer Ralston testified that he noticed the drawstring

---

[12]*See United States v. Santillanes*, 848 F.2d 1103, 1109 (10th Cir. 1988) (finding Fourth Amendment violation where the officers went beyond patting down the defendant's exterior clothing and reached into his pockets).

[13]*Dickerson*, 508 U.S. at 375.

[14]*Id.* at 375–76.

[15]Doc. 45 at 9.

of the bag containing the marijuana before the patdown, hanging out of Defendant's pocket. When he patted down that pocket, he testified that he could feel the drawstring bag, and that "there were two semi-soft packages inside the drawstring bag. . . . I believed them to be marijuana."[16] He testified that he held this belief based on his training and experience, having felt marijuana in baggies in pockets on previous occasions. On cross-examination, he indicated that he could feel the "texture of marijuana through the baggie."[17]

The Court does not credit Officer Ralston's testimony that the marijuana was immediately apparent to him. He testified, and the evidence supports, that he was wearing gloves and that the marijuana was contained in a plastic baggie, inside a thick canvas-like baggie, inside Defendant's pant pocket. Defendant introduced the cloth bag as evidence at the hearing and the Court was able to handle the bag and its contents.[18] While this evidence apparently includes some additional packaging and tape compared to the time of the search from being handled by police, the Court finds that even without the extra packaging, the baggie of marijuana was a very tight fit inside the cloth bag. It is not credible to the Court that Officer Ralston could feel the texture of marijuana through a plastic baggie, inside a heavy cloth bag, inside a pants pocket, and through his glove. Indeed, Officer Ralston asked Defendant what was in his pocket after he felt the bulge. He stated that it felt like there was a baggie, but he made no statements that would indicate his awareness of its contents prior to removing it from his pocket. The Court is therefore unable to find by a preponderance of the evidence that it was immediately

---

[16]Doc. 41 at 8:13–23.

[17]*Id.* at 31:1.

[18]Ex. 3.

apparent to Officer Ralston that Defendant's left pocket contained marijuana.

## 2. Consent

The Government argues in the alternative that the patdown and the search of Defendant's pocket contents were permissible because Defendant consented. "It has long been established that an officer may conduct a warrantless search consistent with the Fourth Amendment if the challenging party has previously given his or her voluntary consent to that search."[19] "The question of whether consent to search was given voluntarily is one of fact based on the totality of the circumstances."[20] "The government . . . bears the burden of demonstrating that the defendant's consent was voluntary."[21]

Officer Ralston testified that he asked Defendant if he could pat him down for weapons and that "he consented." The video does not support this testimony. Officer Ralston told Defendant that he was going to pat him down and then ordered him to turn around before proceeding to pat him down and empty his pockets. Officer Ralston's directive, his show of authority, the fact that he was in uniform and armed, the fact the Defendant was surrounded by three officers, and that his ID had not been returned, all indicate that Defendant did not voluntarily submit to the patdown search.[22] The mere fact that Defendant submitted to the patdown is insufficient to show voluntary relinquishment of his rights.

When Officer Ralston patted down Defendant's left front pocket, he asked what was in it.

---

[19]*United States v. Rosborough*, 366 F.3d 1145, 1151-52 (10th Cir. 2004) (citing *United States v. Ringold*, 335 F.3d 1168, 1174 (10th Cir. 2003)).

[20]*United States v. Poke*, 81 F. App'x 712, 714 (10th Cir. 2003) (citing *United States v. Sanchez-Valderuten*, 11 F.3d 985, 989-90 (10th Cir. 1993)).

[21]*Id.* (citing *Ringold*, 335 F.3d at 1171); *United States v. Harrison*, 639 F.3d 1273, 1281 (10th Cir. 2011).

[22]*Harrison*, 639 F.3d at 1278 (setting forth factors to consider when determining if consent is voluntary).

On the video, it sounds like Defendant says "pull it out." But the video does not make clear which of the several objects in the pocket Officer Ralston asked about, nor which "it" Defendant was referring to—there was a stack of credit cards and a package of kool-aid in addition to the drawstring bag. And because the patdown itself was not supported by reasonable suspicion, nor by Defendant's consent, this argument is moot. The Government has not met its burden of showing that Defendant voluntarily consented to the search of his person.

### B. The Vehicle Search

### 1. Standing

The Government contends that Defendant lacks standing as the passenger to object to the search of the Pontiac. Fourth Amendment rights are personal and cannot be claimed vicariously.[23] "It is immaterial if evidence sought to be introduced against a defendant was obtained in violation of someone else's Fourth Amendment rights."[24] Standing therefore "turns on the classic Fourth Amendment test: whether society is prepared to recognize [a particular] expectation as objectively reasonable."[25]

To establish standing to challenge a vehicle search, Defendant bears the burden of showing that he had a "legitimate possessory interest in or lawful control over the car."[26] In resolving standing issues of this type, the Court considers important, but not determinative, the following factors: "(1) whether the defendant asserted ownership over the items seized from the

---

[23]*Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978).

[24]*United States v. Rascon*, 922 F.2d 584, 586 (10th Cir. 1990).

[25]*United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000).

[26]*United States v. Valdez Hocker*, 333 F.3d 1206, 1208 (10th Cir. 2003).

vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle."[27]  In the case of borrowed vehicles, a defendant must establish a link between himself and the registered owner.[28]  Such a link does not need to include "legal documentation showing a chain of lawful custody from the registered owner to [Defendant]."[29]  If a defendant claims at the suppression hearing that he lawfully borrowed the car from the registered owner or someone with the apparent authority to give possession, such a statement is sufficient to show standing.[30]

Richard testified at the hearing that although she was the legal owner of the Pontiac, Defendant was her boyfriend and they treated the vehicle as joint property.  He had full access to the vehicle, drove it frequently, and paid for gas and repairs.  The evidence was sufficient for Defendant to meet his burden of showing a link to the registered owner such that he has standing to contest the search.  Moreover, even if Defendant had no possessory interest in the vehicle, the law is clear that Defendant has standing to challenge the evidence obtained from the vehicle search if it was the fruit of his unlawful arrest.[31]

## 2.    Search Incident to Arrest

---

[27]*Id.* (citing *Allen*, 235 F.3d at 489).

[28]*United States v. Eckhart*, 569 F.3d 1263, 1275 (10th Cir. 2009).  Given the Court's finding that Defendant had a legitimate possessory interest in the vehicle such that he could contest the search, the Government's argument that he lacked a valid driver's license is irrelevant.  Richard testified that she drove the vehicle; Defendant admits he was a passenger.  He relies only on his possessory interest in the vehicle, not his status as the driver.

[29]*Valdez Hocker*, 333 F.3d at 1208.

[30]*United States v. Beltran-Palafox*, 731 F. Supp. 2d 1126, 1164 (D. Kan. 2010).

[31]*United States v. Eylicio-Montoya*, 70 F.3d 1158, 1164 (10th Cir. 1995); *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) (examining factual nexus requirement between a passenger's detention and the vehicle search).

None of the officers testified that Defendant consented to the search of the vehicle and the video does not reveal any attempt by the officers to obtain Defendant or Richard's consent to search the vehicle. The video shows that they were both handcuffed as soon as the marijuana was discovered in Defendant's pocket and the officers proceeded to search the Pontiac within seconds of that arrest. The Government instead contends that the officers search was lawful under either the search incident to arrest exception or the vehicle exception to the warrant requirement based on the discovery of marijuana on Defendant's person.

The search-incident-to arrest exception to the warrant requirement is intended to "ensure officer safety and prevent the concealment or destruction of evidence."[32] It may "only include 'the arrestee's person and the area within his immediate control . . . mean[ing] the area from within which he might gain possession of a weapon or destructible evidence.'"[33] Since the Supreme Court decided *Arizona v. Gant*, "the scope of a search [incident to arrest] must be strictly tied to and justified by the circumstances which rendered its initiation permissible."[34] Thus, "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."[35] "In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence."[36] "[A] search incident to arrest can also precede

---

[32]*United States v. Hunnicutt*, 135 F.3d 1345, 1350 (10th Cir. 1998).

[33]*Arizona v. Gant*, 556 U.S. 332, 337 (2009) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)).

[34]*United States v. Edwards*, 632 F.3d 633, 643 (10th Cir. 2001) (quoting *Chimel*, 395 U.S. at 762).

[35]*Gant*, 556 U.S. at 349.

[36]*Id*. at 343–44.

the arrest if probable cause for the arrest preceded the search (rather than being justified by the fruits of the search)."[37]

It is clear from the record that Defendant was not standing near the passenger compartment of the vehicle and could not gain possession of a weapon or destructible device. As soon as Officer Green obtained his identification, Defendant was moved to the rear of the vehicle and at the time of the vehicle search, he was handcuffed and surrounded by three officers. If the arrest for possession of marijuana had been lawful, it would have been reasonable for the officers to believe that the vehicle contained evidence of the drug offense. But since the arrest was unlawful, it cannot form the basis for a lawful search incident to arrest, nor a probable cause search under the vehicle exception.[38] The firearm was fruit of the unlawful search.

Officer Green testified that he had no reason to place Defendant under arrest until they discovered the marijuana in his pocket and that they never had a reason to arrest Richard. To the extent the Government now contends that the fire lane violation could form the basis of Defendant's arrest, it would not be sufficient to search the vehicle incident to that arrest. As already discussed, there is no evidence that either Defendant or Richard could obtain a weapon from the vehicle, and there was no reasonable basis to believe that vehicle contained evidence related to the fire lane offense. To the extent the Government contends that Defendant would have been arrested on the Missouri warrant, this too fails to trigger the search incident to arrest exception. The Government has not shown by a preponderance of the evidence that the warrant

---

[37]*United States v. Sanchez*, 555 F.3d 910, 920 (10th Cir. 2009) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980)).

[38]*United States v. Sparks*, 291 F.3d 683, 690 (10th Cir. 2002) (noting that if the officers have "probable cause to believe there is contraband inside an automobile that has been stopped on the road [they] may search it without obtaining a warrant.").

was returned before the vehicle search, nor that the warrant was for an offense that would have justified searching the vehicle. Richard was the owner of the vehicle, so it is likewise not apparent that "an independent, lawful police investigation inevitably would have discovered" the firearm.[39]

### 3. Plain View Doctrine

The Government argues that the firearm was lawfully seized under the plain view doctrine. It relies on Corporal Green's testimony that the driver's side door was open during the encounter, and that as he was standing next to the open door as the other officers were taking Defendant and Richard "into custody," he noticed the firearm on the driver's side floorboard. He could not recall during his testimony exactly when in the sequence of events he noticed the firearm. For the plain view doctrine to apply, (1) "not only must the item be in plain view; its incriminating character must also be 'immediately apparent'"[40]; and (2) "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself."[41]

The Government has failed to meet its burden of showing that Corporal Green had a right of access to the vehicle in the first place. The Government mistakenly claims in its brief that the driver's side door of the Pontiac had been left ajar when Defendant exited the vehicle, citing Corporal Green's testimony. The video does not support this fact. It is clear on the video that

---

[39]*United States v. Beltran-Palafox*, 731 F. Supp. 2d 1126, 1161 (D. Kan. 2010) (citing *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009)). Under Kansas law, if the owner, operator, or person in charge of the vehicle is available to determine the disposition of the vehicle, officers may not impound the vehicle. *United States v. Hannum*, 55 F. App'x. 872, 874–75 (10th Cir. 2003) (citing *Kansas v. Teeter*, 819 P.2d 651, 653 (Kan. 1991)).

[40]*Horton v. California*, 496 U.S. 128, 136 (1990).

[41]*Id.* at 137.

Defendant closed the door behind him when he exited the vehicle. Corporal Green opened the driver's side door only after Defendant was handcuffed when the marijuana was discovered. This puts the case at odds with the cases cited by the Government in support of applying the plain view exception here.[42]

Also problematic is that the video does not make clear exactly when the firearm was discovered during the encounter. The entire encounter lasted approximately thirty minutes, even though the marijuana was discovered around the 7:00 minute mark, at which time Defendant was handcuffed. The first time a firearm is mentioned on the video is at the end when Officer Green informed Defendant he had a felony and could not own a gun "for a period of time." Near the 18:30 minute mark, Corporal Green appears to show Officer Green something on the driver's side of the vehicle. The Court surmises that at this point, Corporal Green showed Officer Green the firearm, which he testified was in plain view on the driver's side floorboard of the vehicle.

By the 18:30 mark, the car had been thoroughly searched and the officers had several opportunities to discover the firearm on the driver's side floorboard. In fact, at the 12:51 mark, Corporal Green can be seen on his knees looking inside the front driver's side of the vehicle, directly at the driver's side floorboard. Even before the bag of marijuana was discovered, Officer Green can be seen on the video leaning into the back driver's side window. At around the 9:40 mark, Officer Green can be seen standing inside the driver's side open door. At the 10:25 mark, Officer Ralston states that they haven't found anything else yet, despite the fact that

---

[42]*See United States v. Corral*, 970 F.2d 719, 722–24 (10th Cir. 1992) (upholding search under plain view exception where passenger door was left ajar when the defendant was validly removed from the vehicle and officer saw a taped package resembling a brick of cocaine behind the passenger seat); *United States v. Montes*, 400 F. App'x 390, 395 (10th Cir. 2010) (upholding search under plain view exception where the defendant left his door open when asked to step out of the vehicle, leaving the grip of his handgun in plain view).

the other two officers are standing inside the open driver and passenger side doors looking through the vehicle. The officers had been searching and looking through the driver's side window and/or door for several minutes prior to Corporal Green discovering the firearm, yet inexplicably, neither officer saw a yellow or gold handgun in a holster on the floorboard of the vehicle. Given the amount of searching that occurred prior to Corporal Green discovering the firearm, the Court cannot find by a preponderance of the evidence that the firearm was immediately apparent to Corporal Green. The plain view exception does not apply.

### C.    Confession

The Government argues that notwithstanding any Fourth Amendment violation, the Court should not exclude Defendant's statements to Officer Cobler and Special Agent Steward. The Supreme Court has made clear that "a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint.'"[43]

The Government argues that notwithstanding any Fourth Amendment violation, Defendant's post arrest statements to Officer Cobler were voluntary and unsolicited, and that his statements to Special Agent Steward were made only after he received Miranda warnings. Neither of these facts is sufficient to purge the taint of the Fourth Amendment violation. Simply because a confession is voluntary under the Fifth Amendment does not purge the taint of an arrest that violates the Fourth Amendment.[44] "If *Miranda* warnings were viewed as a talisman

---

[43]*Oregon v. Elstad*, 470 U.S. 298, 305–06 (1985) (quoting *Taylor v. Alabama*, 457 U.S. 687, 690 (1982)).

[44]*Taylor*, 457 U.S. at 690.

that cured all Fourth Amendment violations, then the constitutional guarantee against unlawful searches and seizures would be reduced to a mere 'form of words.'"[45] The Government points to no intervening event that would break the causal connection between the Fourth Amendment violation and Defendant's post arrest statements. Under these circumstances, the Court finds that these statements should be excluded along with the fruits of the unlawful search.

## III.    Conclusion

While the Court is cognizant that it must view the facts in the light most favorable to the Government, it may not draw inferences that are not supported by the record, nor accept facts that are contrary to the record.[46] There are many inconsistencies in the record between the Topeka Police Officers' testimony, and the video recording of the encounter that took place on March 15, 2013. In sum, the Court finds that the Government has not met its burden of showing that the patdown search of Defendant's person was supported by a reasonable suspicion that he was armed and dangerous.[47] Nor does the evidence support its contention that Defendant consented to a patdown search. Therefore, evidence derived from that search, including the bag of marijuana, must be suppressed. Because the search of the vehicle was not incident to a lawful arrest for possession of marijuana, or based on probable cause, the firearm must also be suppressed as fruit of the unlawful search of Defendant's person. Moreover, the outstanding Missouri warrant did not justify the vehicle search, as the officers testified that they would not

---

[45]*Id.* (quoting *Brown v. Illinois*, 422 U.S. 590, 603 (1975)).

[46]*See United States v. Matthews*, 458 F. App'x 717, 722 (10th Cir. 2012) (quoting *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002)).

[47]*See Florida v. Royer*, 460 U.S. 491, 500 (1983); *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971); *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

have arrested Defendant for that warrant because it was non-extraditable.

Finally, the Government has not met its burden of showing the firearm was discovered under the plain view doctrine because the video of the search does not corroborate Corporal Green's testimony that the driver's side door was ajar after Defendant exited the vehicle, nor that the firearm was readily apparent from his vantage point just after Defendant was handcuffed.

Because the Government has failed to meet its burden of proving that the patdown search of Defendant's person and the vehicle search were lawful under the Fourth Amendment, Defendant's motion is granted and that evidence must be suppressed. Defendant's confession was also tainted by these Fourth Amendment violations and is therefore suppressed.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Suppress (Doc. 28) is **granted**.

**IT IS SO ORDERED**.

Dated: October 21, 2013

        S/ Julie A. Robinson        
        JULIE A. ROBINSON
        UNITED STATES DISTRICT JUDGE